UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RACHEL A. NASANOFSKY, Individually, And As Administrator of the Estate of DAVID H. NASANOFSKY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Civil Action No. 05-10230-WGY |

### PLAINTIFF'S SUPPLEMENTAL RULE 26 (A)(2) DISCLOSURE OF EXPERT TESTIMONY

Plaintiff Rachel A. Nasasnofsky, by her attorney, makes the following supplemental disclosure as required by Fed. R. Civ. P. 26(a)(2).

1. <u>Expert Witnesses</u>

   Alvin S. Blaustein, MD
   Veteran's Administration Medical Center
   Houston TX

2. <u>Expert Reports</u>

   Please refer to Dr. Blaustein's supplemental report attached hereto as Exhibit A, which is incorporated herein.

3. <u>Opinions Expressed by Experts</u>

   Please refer to the expert report attached hereto as Exhibit A.

4. <u>Information Considered by Witnesses</u>

   Please refer to the expert report attached hereto as Exhibit A.

5. <u>Exhibits to Support Opinions</u>

   Any documents, reports, etc. referenced above may be used to support the expert's opinions.

6.  <u>Qualifications of Experts Including Publications Authored Within the Preceding Ten Years</u>

    Please refer to expert witness' curriculum vitae already provided.

7.  <u>Compensation to be Paid to Expert</u>

    Please refer to the attachment to the expert's report already provided.

8.  <u>Cases in which the Expert has Testified as an Expert at Trial or by Deposition within the Preceding Four Years</u>

    Please refer to the attachment to the expert's report already provided.

By plaintiff's attorney,

Date: 5/22/07

Clyde D. Bergstresser, BBO #039200
Scott M. Heidorn, BBO # 661787
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Boston, Massachusetts 02129
(617)241.3000
Fax 617 241.5115

## CERTIFICATE OF SERVICE

I, Scott M. Heidorn, attorney for the plaintiff, Rachel Nasanofsky, hereby certify that on this date I have served a copy of the above document upon all parties of record through Electronic Filing.

Date:  May 22, 2007

Scott M. Heidorn

**ALVIN S. BLAUSTEIN, MD**
Houston Veterans Administration Medical Center
2002 Holcombe Boulevard
Houston TX 77030
713/791-1414

Chief, Department of Cardiology

May 21, 2007

Clyde D. Bergstresser, Esquire
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Boston MA 02129

Re: David Nasanofsky

Dear Mr. Bergstresser:

I have reviewed the following medical records and documents relating to David Nasanofsky, a 52 year old married, father of three who died on July 24, 2002:

- Frederick Dolgin, MD/Manet Community Health Center
- Quincy Hospital Medical Center
- Town of Randolph EMS
- Milton Hospital
- Autopsy report
- Expert report of J. Robert Kirkwood, MD

I have also reviewed the defendant's answers to interrogatories propounded by the plaintiff and the deposition testimony of Dr. Dolgin and Carol Blowers, RN.

Beginning in March 1992, Mr. Nasanofsky, an engineer, regularly sought preventative and episodic medical care from Dr. Frederick Dolgin, his primary care physician at Manet Community Health Center, Inc. in Quincy, Masachusetts.

As early as May, 1992, are entries by Dr. Dolgin relating to his treatment of the patient's labile hypertension, high cholesterol levels, history of tobacco use and sedentary lifestyle. Also noted was a family history of coronary artery disease, including his father's first myocardial infarction at age 55 followed by successful coronary artery bypass surgery.

In October, 1993, Dr. Dolgin documents that he discussed cardiac risk factors with the patient and ordered prophylactic Ecotrin or baby aspirin.

At an appointment in June, 1998 for a complete physical exam, Dr. Dolgin noted a slight weight gain and discussed low cholesterol diet along with checking the patient's cardiac risk profile. A few weeks later, after reviewing the cholesterol level, Dr. Dolgin prescribed Lipitor.

In December, 2000, Mr. Nasanofsky presented to Dr. Dolgin's office with symptoms of an upper respiratory infection. He reported that he had quit smoking five months earlier. His blood pressure was 160/110 – 160/100. Hydrochlorothiazide was prescribed for the high blood pressure and an appointment was made to follow-up in one month.

At the follow-up visit on January 26, 2001, the patient's blood pressure was recorded as 140/90.

On August 8, 2001, he reported for a complete physical exam. His blood pressure that day was 160-162/102-110. Dr. Dolgin started him on Univasc in place of the Hydrochlorothiazide, which the patient reported he had stopped due to the side effect of urinary frequency.

In the office on September 14, 2001 for a blood pressure check, it was 140 to 162 over 90 to 92. The Univasc was increased from 10 to 15 mg every day and the patient was instructed to increase his exercise, with a follow-up appointment in six months.

On March 27, 2002, Mr. Nasanofsky's blood pressure was documented as 144 to150 over 84 to 92. Atenolol was added to his anti-hypertensive medication regimen.

On the morning of July 24, 2002, Mr. Nasanofsky, presented to Dr. Dolgin's office with several complaints including fever, cough of two days duration and mid-sternal chest pain for three days that felt "like someone standing on chest" and was accompanied by nausea. The office nurse's note reports that the "crushing" pain had resolved. However, she indicated in her deposition that he was still experiencing acute chest pain that was rated as '4' on a scale of 1-10. The patient had a heart rate of 88 beats per minute and irregular. His blood pressure was 80/50 in the right arm and 88/50 in the left arm. Dr. Dolgin recorded that the patient had been awakened at 3:00 AM with cough after having experienced seven days of sweats and chills. Examination revealed rales and wheezes in the lungs but no cyanosis or edema. There was no mention of a cardiac examination. An electrocardiogram was interpreted by Dr. Dolgin as normal sinus rhythm. Oxygen saturation on room air was 93%. Dr. Dolgin's assessment was "probable pneumonia." He prescribed inhaled and oral steroids, an antibiotic and ordered a complete blood count, blood cultures and a chest x-ray, but made no reference to the results of the tests.

The chest x-ray was performed later that day at Quincy Medical Center and interpreted that evening with findings of alveolar infiltrates superimposed on bilateral interstitial prominent lung markings which could represent fibrosis with superimposed right

pneumonia. My own review of the x-ray reveals that it represented a more diffuse pattern consistent with pulmonary edema most likely of cardiac origin.

At approximately 6:45 PM that evening, the Town of Randolph Emergency Medical Services responded to a call at Mr. Nasanofsky's home. The record indicates that EMS was summoned for a patient with shortness of breath. Upon arrival, the EMS team found Mr. Nasanofsky on the floor, in severe respiratory distress. His cough appeared to be producing vomitus and he was unable to speak in full sentences. Placed on nasal oxygen at 1.5 liter per minute, he quickly became apneic. An oral airway was placed and ventilatory support was initiated. An attempt to intubate was unsuccessful. On ECG, a cardiac rhythm was present; however, there was no evidence of pulse or blood pressure. PEA (pulseless electrical activity) deteriorated to asystole. Resuscitation efforts, begun at the scene, continued in the ambulance to Milton Hospital and in the Emergency Room for another ten minutes without success. Mr. Nasanofsky was pronounced dead at 7:45 PM on July 24, 2002.

An autopsy performed the next day revealed an acute myocardial infarction extensively involving the left ventricle wall secondary to occlusive thrombus and intraplaque hemorrhage in the mid left circumflex artery. The posterior papillary muscle, which supports the mitral valve, had ruptured and there was subacute epicarditis over the posterior left ventricle. The area of the infarct and the papillary muscle was necrotic with infiltration of neutrophils, congestion and edema. These findings indicate that the infarct was already well established and *did not occur* at the time of the collapse on the evening of July 24th.

My opinions expressed in this report are based upon my review of the aforementioned materials and my education, training and experience as an internist with expertise in cardiology and pulmonary medicine. Further, all such opinions are held to reasonable degree of medical probability. As an Associate Professor of Medicine at Baylor University School of Medicine, I am familiar with the standard of care applicable to internists and primary care physicians in the care of patients such as this one.

Dr. Frederick Dolgin departed from the standard and accepted practice of the average qualified internist practicing in 2002 when he failed to adequately assess, evaluate and diagnose David Nasanofsky's life-threatening illness during the office visit on July 24, 2002. The patient presented to his primary care physician with classical ischemic chest pain that had begun several days earlier. Classical "angina" has a positive predictive value for coronary artery disease proven by angiography in over 90% of subjects. Its accuracy does not require other supportive clinical data. Myocardial infarction or ischemia occurs with normal ECG in 15-20% of patients presenting to a physician. This well known fact requires that physicians not depend of ECG findings to pursue more aggressively a diagnosis of myocardial infarction.

Consistent with the standard of care to be expected of the average qualified internist or primary care physician, Mr. Nasanofsky's history alone (including chest pain that at times felt "like someone was standing on [his] chest," nausea, irregular heart beat and

hypotension) in conjunction with the patient's cardiac risk factors of hypertension, history of tobacco use, elevated serum cholesterol and a family history of premature coronary artery disease should have prompted Dr. Dolgin to place at the top of his list of differential diagnoses an acute coronary event in progress, requiring immediate hospitalization for further evaluation and treatment.

Consistent with the standard of care, Dr. Dolgin should have ordered a STAT chest x-ray and should have requested that the radiologist rule out congestive heart failure rather than stating a presumed diagnosis of pneumonia alone. It is now known that chest x-ray ordered by Dr. Dolgin was likely not read until around the time of Mr. Nasanofsky's death on the evening of July 24th. The fact that the chest x-ray was interpreted by Dr. Babington Yung as consistent with pneumonia does not alter my opinion that the description and appearance were also compatible with alveolar edema due to acute heart failure. I have reviewed the expert report of radiologist J. Robert Kirkwood, MD, who concurs that the chest x-ray was consistent with congestive heart failure and a slightly enlarged heart. It was a departure from the standard of care for Dr. Dolgin to have ordered a <u>routine</u> diagnostic chest x-ray instead of a STAT film with urgent interpretation.

At the time of Mr. Nasanofsky's visit to Dr. Dolgin on the morning July 24th, his blood pressure was alarmingly low, far below any other recorded values over a ten year period. In a symptomatic patient with evidence of a serious precipitating illness, whether infection or myocardial infarction, hypotension is a marker of a grave and dangerous clinical situation mandating emergency hospital admission. In the setting of myocardial injury, it connotes extensive damage and impending shock.

The medical records indicate that Dr. Dolgin was well aware of his patient's poorly controlled cardiovascular risk factors including hypertension, history of tobacco use, elevated serum cholesterol and a family history of premature coronary artery disease. Mr. Nasanofsky was overweight, with his weight increasing from 182 pounds in 1992 to 223 pounds in March of 2002. It is documented in the patient's chart that his father, who succumbed to heart disease in 1978, had suffered his first myocardial infarction at age 55.

It was a departure from the standard of care for Dr. Dolgin not to have immediately sent Mr. Nasanofsky to an Emergency Room where the evaluation of myocardial infarction would include measurement of serum biomarkers for cardiac injury and further assessment of hypotension and a grossly abnormal chest x-ray. Appropriate testing, including cardiac enzyme tests would have revealed the myocardial injury. Once admitted, the patient would be evaluated by a cardiologist and administered medication to manage the myocardial infarction, including anticoagulant therapy and to elevate his blood pressure. He would have been given oxygen and admitted to an intensive care setting for cardiac monitoring.

Consistent with the standard of care, an echocardiogram would have been performed immediately demonstrating the region of cardiac injury, severe mitral insufficiency and papillary muscle rupture. This alone would have identified the direct cause of Mr.

Nasanofsky's symptoms. Early, if not immediate, coronary angiography would have been performed and with it percutaneous insertion of an intraaortic balloon for hemodynamic support. Cardiac surgeons would have been consulted and the operating room prepared for urgent revascularization and valve replacement. Alternatively, the angiographer could have employed procedures to re-establish blood flow along with potent clot inhibitors and modifiers of ischemia (beta adrenergic blockers and nitrates) and if stable surgery undertaken in the next few days. By 2002, emergency surgery in this setting had a published 30 day survival of 70-75%.

As I indicated earlier in this report, an ECG alone is inadequate and a normal ECG does not satisfactorily exclude myocardial infarction. Pursuant to the standard of care, had this patient been urgently hospitalized by Dr. Dolgin on July 24, 2002, for evaluation and treatment of his cardiac condition, pursuant to the standard of care, it is likely that his myocardial infarction would have been diagnosed and his condition would have been stabilized. Complications of acute mitral insufficiency and cardiogenic shock would more likely than not have been avoided or effectively treated and he would have survived his illness. It is likely that his life expectancy going forward from that time would have been in the range of 60% at 5 years with NYHA (New York Heart Association) Class I or II functional status. Following this, if he was not in heart failure at 5 years, his life expectancy going forward would have been in the range of 90% at ten years (five additional years) with NYHA Class I or II functional status, and if he was in heart failure his life expectancy going forward would have been in the range of 50% at ten years with a reduced functional status.

Signed:

05/20/2007

_____
Alvin S. Blaustein, MD