**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RACHEL A. NASANOFSKY, Individually, And As Administrator of the Estate of DAVID H. NASANOFSKY,<br><br>            Plaintiff,<br><br>      v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>            Defendants. | **Civil Action No. 05-10230-WGY** |

**UNITED STATES' NOTICE OF SUPPLEMENTAL DISCLOSURE
OF EXPERT TESTIMONY PURSUANT TO FED. R. CIV. P. 26**

   Defendant United States makes the following supplemental disclosure of expert testimony pursuant to Fed. R. Civ. P. 26(a)(2) ( C ), 26(a)(3), and 26(e). The required disclosure information with respect to the Government's expert, Joseph M. Weinstein, M.D., has been provided previously in accordance with Fed. R. Civ. P. 26(a)(2)(B). The supplemental disclosure of Dr. Weinstein is attached to this notice as Exhibit A. Other materials relevant to Dr. Weinstein's testimony are disclosed in the parties' joint pretrial memorandum (Docket No. 30).

        Respectfully submitted,

        UNITED STATES OF AMERICA

        MICHAEL J. SULLIVAN
        United States Attorney


By:    /s/ Anton P. Giedt   5/25/2007
        Anton P. Giedt
        Assistant U.S. Attorney
        1 Courthouse Way
        Boston, MA 02210
        617-748-3309 (Voice)
        617-748-3967 (Fax)
        anton.giedt@usdoj.gov

---

**CERTIFICATE OF SERVICE**

Suffolk, ss.                                                                                                Boston, Massachusetts
                                                                                                                              DATE: may 25, 2007

   I, Anton P. Giedt, Assistant U.S. Attorney, do hereby certify that I have this day served a copy of the foregoing upon counsel of record in this action through Electronic Filing.

                                                                           /s/ Anton P. Giedt
                                                                           Anton P. Giedt
                                                                           Assistant U.S. Attorney

Case 1:05-cv-10230-WGY    Document 33-2    Filed 05/25/2007    Page 1 of 7

U.S. Supp Exprt Disclsr - 5/25/2007    Nasanofsky-v-U.S. 05-10230-WGY    EXHIBIT A

# Bridgewater Goddard Park Medical Associates, Inc.



508-894-0400
May 24, 2007          www.bgpma.com

Attorney Anton P. Giedt
Assistant United States Attorney
United States Attorney's Office
United States Courthouse, Suite 9200
One Courthouse Way
Boston, Massachusetts 02210
Fax: 617-748-3967

Re: Estate of David Nasanofsky vs. United States, et al
    United States District Court 05-10230

Dear Attorney Giedt,

I am in receipt of your recent communication of May 22, 2007 and the enclosed document. At your request, I have reviewed the May 21, 2007 letter of Dr. Alvin S. Blaustein, the chief of the Department of Cardiology at the Houston Veterans Administration Medical Center. Please refer to my previous letter of April 27, 2007 for the details of the medical records and my initial expert opinion.

As you are aware, I am a physician licensed to practice medicine in the Commonwealth of Massachusetts. I am Board Certified in Cardiology, Internal Medicine, and Nuclear Cardiology. I practice Cardiology and Internal Medicine, and am familiar with the standard of care in the year 2002 of patients who present with chest pain and shortness of breath.

As you are aware, Mr. David Nasanofsky was a 52 year old male with a past medical history of tobacco abuse, obesity, hypertension, hyperlipidemia, erectile dysfunction, a family history of coronary artery disease, and recurrent episodes of bronchitis. The patient had been treated with Lipitor for hyperlipidemia, Atenolol, Univasc and Hydrochlorothiazide for hypertension, and with smoking cessation counseling for cigarette abuse. On Wednesday, July 24, 2002, Mr. Nasanofsky presented to the Manet Community Health Center with complaints of seven days of sweats and chills, two days of cough, and three days of mid-sternal chest pain that was described as "like someone was standing on his chest." The patient also noted nausea. The nurse's notes stated that the pain had resolved, but also noted a blood pressure of 80/50 bilaterally, a heart rate of 88 that was irregular, and an oxygen saturation of 93% on room air. The examination of Dr. Dolgin revealed bilateral wheezing as well as rales in the right middle lobe distribution. The heart sounds were regular, and the extremities revealed no edema. An electrocardiogram was reported as normal sinus rhythm. The impression of Dr. Dolgin was that of a probable pneumonia, and the patient was

110 Liberty Street                322 East Center Street              1215 Broadway
Brockton, Massachusetts     West Bridgewater, Massachusetts     Raynham, Massachusetts
02301                             02379                              02767

begun on Levaquin 500 mg a day and prednisone 60 mg a day. Laboratory blood work revealed a white count of 15.8, hematocrit of 39.9 and a platelet count of 282,000. A chest X-Ray was performed at Quincy Medical Center at 10:46 AM, and was interpreted as consistent with a right lower lobe and right middle lobe pneumonia, with bilateral interstitial lung markings which could represent pulmonary fibrosis. Mr. Nasanofsky was stable for the remainder of the day on July 24th, until 6:30 PM when he developed the acute onset of severe shortness of breath. Emergency Medical Services were summoned, and found the patient in severe respiratory distress. No oxygen saturation could be obtained, and the patient was placed on 15 liters of oxygen. The patient then had a witnessed respiratory arrest. Pulseless Electrical Activity (PEA) developed shortly thereafter, which did not respond to CPR, atropine, epinephrine and to intravenous fluids. The patient was transported to the Milton Hospital, where he remained in pulseless electrical activity or asystole. The patient did not respond to any form of therapy, and was pronounced at 7:45 PM.

An autopsy was performed the following day by Dr. Keller, and this revealed an acute myocardial infarction involving the posterior wall of the left ventricle. The myocardial infarction was caused by an occlusive thrombus of the mid left circumflex coronary artery. There was also evidence of a rupture of the posterior papillary muscle of the mitral valve apparatus, which caused acute mitral regurgitation and pulmonary edema. The microscopic findings revealed that the myocardial infarction was days old. The autopsy also revealed that there was severe three vessel coronary artery disease, with a 70% left anterior descending coronary artery stenosis, and a 75% stenosis of the right coronary artery.

In his letter of May 21, 2007, Dr. Alvin Blaustein notes that
> "an echocardiogram would have been performed immediately demonstrating the region of cardiac injury, severe mitral insufficiency and papillary muscle rupture. This alone would have identified the direct cause of Mr. Nasanofsky's symptoms. Early, if not immediate, coronary angiography would have been performed and with it percutaneous insertion of an intraaortic balloon for hemodynamic support. Cardiac surgeons would have been consulted and the operating room prepared for urgent revascularization and valve replacement."

The comments of Dr. Blaustein are not consistent with the presentation of Mr. Nasanofsky to the office of Dr. Dolgin. First, the clinical appearance of a patient who is ambulatory, as Mr. Nasanofsky was, with a blood pressure of 80/50 and with an oxygen saturation of 93% is inconsistent with a patient who has experienced a rupture of the posterior papillary muscle of the mitral valve. The rupture of the papillary muscle occurred a few minutes before the terminal events of Mr. Nasanofsky's life later in the day and around 6:40 PM. Based on the findings of the autopsy report and the records of the Town of Randolph Emergency Medical Services describing Mr. Nasanofsky's collapse, the rupture of the posterior papillary muscle was sudden and was not a gradual event. The rupture caused instant severe heart failure, and the severe respiratory distress that

2

was evident on arrival of the Emergency Medical Services from the Town of Randolph. The rupture of the papillary muscle did not occur before these events, as the total rupture of a papillary muscle is incompatible with life. The patient could not have walked into or out of the office of Dr. Dolgin or into the radiology suite at Quincy Medical Center if he had a complete transection of the posterior papillary muscle, or if the rupture was already in progress.

It is also important to note that an echocardiogram at this time would have revealed the area and the extent of the heart that had been damaged by the heart attack (the posterior wall), but would not have shown any problem with the mitral valve. The mitral valve papillary muscle did not rupture until the onset of the severe shortness of breath at 6:40 PM, and no echocardiogram in the morning or afternoon of July 24, 2002 would have revealed or predicted a papillary muscle rupture.

The second aspect of Dr. Blaustein's opinion that is inconsistent with the medical record is the question of the possibility of the patient having mitral valve replacement and coronary artery bypass surgery. Mr. Nasanofsky's chest X-Ray was performed at 10:34 AM on July 24, 2002. Even if it is assumed that Dr. Dolgin admitted Mr. Nasanofsky to the hospital on July 24th, 2002 and ordered a STAT chest X-Ray as well as the other tests suggested by Dr. Blaustein, there is no evidence that Mr. Nasanofsky would have survived given the fact that his death was caused by a sudden and complete rupture of the posterior papillary muscle of the mitral valve. The standard of care which Dr. Blaustein notes would have included the referral of Mr. Nasanofsky to an Emergency Room. More specifically, the standard of care requires that a physician refer a patient with a suspected cardiac condition to the closest Emergency Room. In the case of David Nasanofsky, the closest Emergency Room would have been the Quincy Medical Center – a community hospital with a coronary care unit, but no cardiac catheterization or cardiac bypass capabilities. The standard of care in Massachusetts in 2002 did not require a physician to admit a patient with a suspected myocardial infarction to a Tertiary care facility – the type of facility which would have been required to perform coronary angiography, the placement of an intraaortic balloon pump, coronary artery bypass grafting and mitral valve replacement.

The standard of care required that the patient be referred to the closest Emergency Room, so that cardiac monitoring could be performed. Under these circumstances, it is important to note the time sequence that Mr. Nasanofsky would likely have experienced if he had been admitted to the Quincy Medical Center at 10:30 AM for evaluation, diagnosis and treatment. The sequence would likely have included the following:
- Admission to the Quincy Medical Center, with examination by a physician, obtaining laboratory values, an EKG, chest X-Ray, and institution of cardiac monitoring. The laboratory values would have

- required a 45 minute turn around time, and the other tests and evaluations would likely have taken at least two hours.
- Consultation by a cardiologist, including the time to come to the Emergency Room, evaluate the patient, and document his findings. This would likely have taken at least an hour.
- The performance of an echocardiogram, which would have taken at least sixty minutes for the technician to come to the Emergency Room and to do the study.
- Communication with a Boston Teaching Hospital with cardiac catheterization and cardiac surgery facilities, and obtaining approval for transfer. This would have taken at least thirty minutes.
- Obtaining ambulance or Med-Flight to come to Quincy Medical Center, and transfer Mr. Nasanofsky to a Boston Teaching Hospital. This would have taken at least one hour.
- Initial evaluation at a Boston Teaching Hospital, with the performance of a history and physical and pre-catheterization evaluation. The patient would have been evaluated by a cardiology fellow and an attending. Informed consent would also be obtained. This would have taken at least one hour.
- Performance of a cardiac catheterization, including a right heart catheterization and left heart catheterization, and insertion of an intraaortic balloon pump. This would also entail administration of anesthesia or sedation, and would have taken at least ninety minutes.
- Consultation with a cardiac surgeon, who would have reviewed the catheterization films, performed a history and physical, and obtained informed consent. Blood would also have to be typed and crossed in the Blood Bank for surgery. This would have taken at least one hour.
- Transfer to the operating room and evaluation by the anesthesiologist. This would have taken at least thirty minutes.

It is clear that this process would have taken nine and a half hours, which would put the time at 7:00 PM, and this assumes that there were no delays, and that the entire process was expedited. The patient would still have arrested prior to this, and unless the patient was already on cardiopulmonary bypass at this time, there is no evidence that he would have been able to be resuscitated. The cause of death in Mr. Nasanofsky was a sudden and complete rupture of the papillary muscle, and as has been noted before, this is not compatible with life. Therefore, there is no evidence that Mr. Nasanofsky would have survived if he had been admitted to Quincy Medical Center on the morning of July 24th, 2002.

The damage to the heart muscle had already been done by the heart attack that had occurred days before. Once this portion of the heart muscle had been damaged, the events that caused Mr. Nasanofsky's death were set into motion and were in the process of causing his death, unless bypass surgery and a valve replacement were performed immediately. Given the facts that Mr. Nasanofsky presented to the doctor's office on Wednesday morning with several days of chest pain, fevers, chills, and cough, the fact that he was ambulatory, the fact that his oxygen saturation was 93%, and that his blood pressure was 80/50, there was no

4

indication of an ongoing or imminent rupture. There was not enough time to prevent his death even if he had been treated urgently. The damage had already been done between Friday night and Wednesday morning.

The issue of the blood pressure of Mr. Nasanofsky is also an important subject. The blood pressure of 80/50 in a patient who had a history of hypertension is not a specific or reliable indicator of cardiac disease. The causes of hypotension are numerous, and the most common include dehydration, infection, excessive use of diuretics, lack of adequate oral intake due to nausea, fever, as well as a host of other etiologies. A myocardial infarction can also cause hypotension. Hypotension in the setting of a patient who has a history of hypertension may be an indication of impending cardiac dysfunction. However, hypotension is not an indicator of impending mitral valve rupture. The blood pressure of 80/50 in the case of Mr. Nasanofsky was not associated with signs of hypoperfusion at the time of his visit with Dr. Dolgin. The signs and symptoms of hypoperfusion or shock would have included tachycardia, decreased mental alertness, cool and clammy skin, and inability to ambulate or remain upright. The blood pressure of Mr. Nasanofsky was indeed lower than it had historically been, but the heart rate was 95 beats per minute on the EKG, the patient ambulated in and out of the office, and was able to interact with Dr. Dolgin during the visit and give a history to the nurse and the physician. There were no signs of hypoperfusion, or lack of blood flow to vital organs. Furthermore, the blood pressure of 80/50 is not an indication of mitral insufficiency and is also not an indication for immediate surgery.

The fourth issue is the estimation of survival given by Dr. Blaustein. Dr. Blaustein notes that emergency surgery in 2002 would have had a published 30 day survival of 70 – 75%. It is important to note that cardiogenic shock carries a 80 to 90% mortality for the thirty day time frame after the heart attack, and that emergency surgery does not change this mortality rate. There has unfortunately been no change in the mortality rate of cardiogenic shock. Dr. Blaustein notes a mortality rate of 75% for all emergency bypass surgery, but this rate does not incorporate patients who are in cardiogenic shock who have a much higher mortality rate.

The next issue is that Dr. Blaustein notes that had Mr. Nasanofsky been admitted, it is "likely that his myocardial infarction would have been diagnosed and his condition would have been stabilized." He further notes that the complications of acute mitral insufficiency and cardiogenic shock would more likely than not have been avoided or effectively treated, and that Mr. Nasanofsky would have survived his illness. As explained above and in my previous letter, there is no evidence that the complications of acute mitral insufficiency and/or cardiogenic shock were detectable upon initial presentation, or that they would have been avoided even under expedited treatment. There are no medications or procedures, such as potent clot inhibitors, thrombolytics or other drugs which would have prevented the mitral valve papillary muscle rupture. The only thing that would have avoided

death would have been to replace the mitral valve before the papillary muscle ruptured. As is noted above, the time line suggests that this was, to a reasonable degree of medical certainty, unlikely.

Finally, it is unclear where the life expectancy percentages that Dr. Blaustein notes originate from. Given the extent of the myocardial infarction involving the posterior wall of the left ventricle, the severe three vessel coronary artery disease, and the need for a mitral valve replacement, the estimated life expectancy is much less than 60%, and is more likely to be in the 30 – 35% range. It is also important to note that Mr. Nasanofsky would have been left with significant left ventricular dysfunction, and to a reasonable degree of medical certainty, would have had significant congestive heart failure symptoms – all due to the heart attack he had suffered prior to seeing Dr. Dolgin on July 24th, 2002. The degree of cardiac dysfunction also suggests that to a reasonable degree of medical certainty, Mr. Nasanofsky would not have been able to return to work as an engineer. The patient would have been considered New York Heart Association Class III given the autopsy findings of the extent of his coronary artery disease, the size of the infarction, and the need for a prosthetic mitral valve, as well as the need for medications.

In summary, it is important to note the presentation of Mr. Nasanofsky on July 24th, 2002. It is clear that the symptoms that Mr. Nasanofsky exhibited on July 24th, 2002, as well as the oxygen saturation and the fact that he ambulated into and out of the office were such that no physician would have been compelled to make the diagnosis of an impending rupture of the posterior papillary muscle of the mitral valve. Furthermore, even if aggressive diagnostic procedures had been urgently employed, such as an echocardiogram as suggested by Dr. Blaustein, these modalities would still not have revealed or predicted the sudden and complete rupture of the posterior papillary muscle that Mr. Nasanofsky suffered.

There is no evidence that Mr. Nasanofsky would have survived the rupture of the posterior papillary muscle of the mitral valve if he had been admitted to the Milton Hospital or Quincy Medical Center on the morning of July 24, 2002. There is no evidence that the complication of acute mitral insufficiency could have been avoided or effectively treated in a community hospital. The rupture of the posterior papillary muscle of the mitral valve and the development of cardiogenic shock with pulseless electrical activity was a fatal complication of the myocardial infarction suffered by Mr. Nasanofsky several days prior to being seen by Dr. Dolgin. This could not have been prevented even if Dr. Dolgin had admitted Mr. Nasanofsky to Quincy Medical Center or to Milton Hospital.

Therefore, even if Mr. Nasanofsky had been in a Coronary Care Unit at Quincy Medical Center, the patient would still have developed acute pulmonary edema and cardiogenic shock, and died as a result of the rupture of the posterior papillary muscle of the mitral valve at 6:45 PM on July 24, 2002. In addition, even if Mr. Nasanofsky had been transferred to a tertiary care hospital in Boston, the events

of the evening of July 24, 2002 would have occurred and were not compatible with life. The damage done by the heart attack that Mr. Nasanofsky had several days prior to seeing Dr. Dolgin on July 24th, and the subsequent rupture of the posterior papillary muscle at 6:45 PM on July 24th, 2002 was so severe and extensive that no intervention by any physician could have prevented his death.

These opinions are stated to a reasonable degree of medical certainty, based on my education, training, experience, and review of the records in this case and the relevant medical literature. Should you have any questions, please do not hesitate to call.


Sincerely,

*[signature]*

Joseph M. Weinstein, M.D.