UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RACHEL A. NASANOFSKY, Individually, And As Administrator of the Estate of DAVID H. NASANOFSKY,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>Defendants. | Civil Action No. 05-10230-WGY |

**PLAINTIFF'S SUPPLEMENTAL RULE 26 (A)(2) DISCLOSURE
OF EXPERT TESTIMONY IN REBUTTAL TO DEFENDANT'S DISCLOSURE**

Plaintiff Rachel A. Nasasnofsky, by her attorney, makes the following supplemental disclosure as required by Fed. R. Civ. P. 26(a)(2). This disclosure is in response to the supplemental disclosure by the defendant on May 25, 2007.

1. Expert Witnesses

    Alvin S. Blaustein, MD
    Veteran's Administration Medical Center
    Houston TX

2. Expert Reports

    Please refer to Dr. Blaustein's supplemental report attached hereto as Exhibit A, which is incorporated herein.

3. Opinions Expressed by Experts

    Please refer to the expert report attached hereto as Exhibit A.

4. Information Considered by Witnesses

    Please refer to the expert report attached hereto as Exhibit A.

5. <u>Exhibits to Support Opinions</u>

Any documents, reports, etc. referenced above may be used to support the expert's opinions.

6. <u>Qualifications of Experts Including Publications Authored Within the Preceding Ten Years</u>

Please refer to expert witness' curriculum vitae already provided.

7. <u>Compensation to be Paid to Expert</u>

Please refer to the attachment to the expert's report already provided.

8. <u>Cases in which the Expert has Testified as an Expert at Trial or by Deposition within the Preceding Four Years</u>

Please refer to the attachment to the expert's report already provided.

By plaintiff's attorney,

Date: 6/5/07

_____
Clyde D. Bergstresser, BBO #039200
Scott M. Heidorn, BBO # 661787
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Boston, Massachusetts 02129
(617)241.3000
Fax 617 241.5115

### CERTIFICATE OF SERVICE

I, Scott M. Heidorn, attorney for the plaintiff, Rachel Nasanofsky, hereby certify that on this date I have served a copy of the above document upon all parties of record through Electronic Filing.

Date: June 5, 2007

_____
Scott M. Heidorn

ALVIN S. BLAUSTEIN, MD
Houston Veterans Administration Medical Center
2002 Holcombe Boulevard
Houston TX 77030
713/791-1414

June 4, 2007

Clyde D. Bergstresser, Esquire
Campbell Campbell Edwards & Conroy
One Constitution Plaza
Boston MA 02129

Re: David Nasanofsky

Dear Mr. Bergstresser:

I have reviewed Dr. Joseph Weinstein's May 24, 2007 analysis of the events leading to Mr. David Nasonofsky's death. I have a very different opinion and one supported not only by the record but also by the practice of cardiology in 2002, including the practice in a major medical center like Boston, Massachusetts. Dr Weinstein has built into his hypothetical timeline delays which I believe are exaggerated and unlikely to reflect the standard of practice at that time. In particular, he underestimates the urgency with which hospitals in the Boston area, including Quincy Medical Center, would address the diagnosis and management of myocardial infarction.

As a matter of record, Mr. Nasonofsky presented on the morning of July 24, 2002 with 7 days of symptoms, the last 3 of which included intense chest pressure. As correctly stated, the patient walked in with a blood pressure recorded in each arm of 80 mm Hg systolic, much below the patient's usual. I agree with Dr Weinstein's interpretation that the patient could not have been in full blown cardiogenic shock (that is, shock due to heart pump injury and failure) and ambulating, nor would he likely have had a saturation of 93% with either pneumonia and interstitial lung disease, or pulmonary edema. Therefore, at this point, had the patient been transported directly to Quincy Medical Center emergency department, evaluation, care and treatment should, and very likely would, have commenced hours earlier than Dr. Weinstein's analysis indicates, permitting appropriate intervention when treatment would have favorably altered the outcome. Additionally, it is common for the blood leukocyte count to be elevated after myocardial infarction, and for there to be fever since there is a brisk inflammatory response which peaks at 2-4 days after infarct. It is this inflammation that is the source of some of the later appearing biomarkers of infarction.

Instead, myocardial infarction was never considered as a possible explanation despite the classical history Mr. Nasonofsky described and which was dutifully recorded. A competent emergency room team would without doubt have included infarction and pulmonary edema in their differential diagnosis on admission. In fact, Quincy Medical

Center has been affiliated with Boston Medical Center, and Boston has been in the forefront of rapid early intervention for myocardial infarction, which is now a national initiative. Instead, Dr. Dolgin prescribed oral antibiotics and prednisone (which is <u>absolutely</u> contraindicated in the presence of myocardial infarction because of it is known to promote cardiac rupture and aneurysm formation).

Among the initial management at the ED consistent with the standard of care, diagnostic labs, a chest xray and biomarkers for cardiac injury would have been performed and within 45 minutes the diagnosis of myocardial infarct would have been confirmed. Allowing for transport time from the offices at Manet Community Health Center, it would not yet have been noon on July 24, still six hours prior to Mr. Nasonofsky's collapse. Within several minutes after the diagnosis and chest x-ray (completed at approximately 10:30 AM), consistent with the standard of care the ER staff would have contacted their affiliate and Mr. Nasonofsky would have been in a major hospital in Boston such as the Massachusetts General or the Boston Medical Center, with advanced facilities including a full time cardiovascular surgery team. Quincy Medical Center being less than 15 miles from Massachusetts General and less than 10 miles from Boston Medical Center, ambulance transport or med flight would have been less than 30 minutes.

There, consistent with the standard of care, cardiology fellows and staff would have been waiting and would have seen the patient quickly (no longer than 30minutes) and made a rapid disposition which would have depended on the patient's clinical status at that time. It is likely a stat cardiac echo would have been performed, one which the cardiologists would likely have done, and which I personally have done many times in these situations.

Mr. Nasonofsky's condition at that time would most likely have reflected acute heart failure and evidence of mitral valve insufficiency. Contrary to Dr Weinstein's allusion, myocardial rupture is rarely a sudden event. Rather than a "blow out" it is dissection through necrotic tissue at the margin of healthy heart muscle, a gradual tearing, not a single sudden catastrophic event. Therefore almost certainly the valve would have been leaking prior to death. My interpretation is supported by the presence of inflammatory cells at the region of infarct which Dr Weinstein correctly interprets as indicating the infarction was days old.

My timeline based on competent care by experienced emergency room physicians and cardiologists, and the standard of care for a critically ill patient with MI would have had Mr. Nasonofsky ready for invasive testing by no later than 1:30 PM. An angiogram can easily be completed with 30-45 minutes from the time the patient arrives in the lab. He would have gone directly from the ER to the cardiac catheterization lab. Even had cardiothoracic surgery not yet been called, they would have seen the angiogram while he was still in the procedure lab. Within 1 hour from that point he would have been on circulatory support and ready for surgery. The time is then 3 PM.

I have been and continue to be actively involved the care of critically ill cardiac patients like Mr. Nasonofsky. I staff the CCU several months each year, perform and interpret transthoracic and transesophageal echocardiograms in intensive care and in

cardiothoracic surgical suites. The timeline I suggest is perfectly consistent with the standard of care since thrombolytic and primary intervention became preferred care at times relevant to this opinion.

I also strongly disagree with Dr. Weinstein's assessment of Mr. Nasonofsky's outcome. Surgery for acute mitral insufficiency after MI has been published and performed since the 1970's. The most common cause is papillary muscle rupture. The occluded vessel and injured papillary muscle found at autopsy are the most common occurring approximate 3 times more than at other sites. The outcome of this surgery must be interpreted in the context of the specific centers performing the surgery. Large Boston hospitals were among the pioneers of this surgery and outcomes are excellent with one year survivals as high as 75%. Mr. Nasonofsky had already identified himself as a "survivor" making it through his infarct and the early stages of mitral insufficiency and he is likely to have done well. Bypass surgery in patients with three vessel coronary artery disease described at autopsy and ejection fraction <50% extends life with excellent 5 year survival. This data has been part of the medical literature since the 1980's.

Finally, one cannot reasonably determine the extent of infarction and the degree of salvage from an autopsy done hours (likely hypotensive and hypoxic) after definitive supportive and corrective therapies would otherwise have been initiated. In these last hours, additional injury occurs, sometimes quite distant from the primary infarct. After successful surgery we have life-extending medications that are very powerful and reduce recurrent events by as much as 50% and salvage from proper intervention combined with these would have had a substantial impact on Mr. Nasonofsky's quantity and quality of life. I disagree with Dr. Weinstein's characterization of the functional status that the patient likely would have regained. His function status would likely have permitted him to resume his functions as an engineer.

Signed:

_Alvin S. Blaustein_  6/4/2007
Alvin S. Blaustein, MD